**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY J. HICKMAN, | ) | |
| | ) | Civil Action No. 11-422 |
| Plaintiff, | ) | |
| | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | ECF Nos. 10, 12 |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.   INTRODUCTION

Timothy J. Hickman ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),

seeking review of the final determination of the Commissioner of Social Security ("Defendant"

or "Commissioner") denying his application for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  This matter comes before the court on cross

motions for summary judgment.  (ECF Nos. 10, 12).  The record has been developed at the

administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment is

DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI with the Social Security Administration on April 4, 2007.  (R. at 143 – 50)[1].  Back and leg pain allegedly disabled Plaintiff beginning December 22, 2006.  (R. at 143 – 50).   Plaintiff's application was denied on June 8, 2007, and Plaintiff did not appeal the decision.  (R. at 69 – 77).  As a result, the denial represented the final determination of the Commissioner.  (R. at 14).

Plaintiff filed a second application for DIB and SSI on August 27, 2008, alleging disability based upon the same grounds and, again, beginning on December 22, 2006.  (R. at 151 – 57).  This second application was denied on November 13, 2008.  (R. at 78 – 87).  A hearing was scheduled for May 25, 2010, and Plaintiff appeared to testify represented by counsel.  (R. at 31 – 54).  A vocational expert also testified.  (R. at 31 – 54).  The Administrative Law Judge ("ALJ") issued a decision denying benefits to Plaintiff on June 18, 2010.  (R. at 11 – 30). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on February 25, 2011, thereby making the decision of the ALJ the final decision of the Commissioner.  (R. at 1 – 6).

Plaintiff filed his Complaint in this court on March 30, 2011.  (ECF No. 1).  Defendant filed his Answer on June 7, 2011.  (ECF No. 6).   Cross motions for summary judgment followed.  (ECF Nos. 10, 12).

---

[1]    Citations to ECF Nos. 7 – 7-18, the Record, *hereinafter*, "R. at __."

III.   **STATEMENT OF THE CASE**[2]

A.  **General Background**

Plaintiff was born on September 9, 1974, and was thirty five years of age[3] at the time of his administrative hearing.  (R. at 34 – 35).  He was married and lived at home with his wife and two teenage children.  (R. at 35).  Plaintiff completed the ninth grade, but did not continue with formal education.  (R. at 35).  He did eventually obtain his GED.  (R. at 35).  He also completed a training course for welding at the New Castle School of Trades in New Castle, Pennsylvania. (R. at 35).

Due to a history of back injury, Plaintiff claimed that he was unable to engage in full-time employment as of December 22, 2006, but was able to maintain part-time employment until 2008.  (R. at 36).  From 2006 until 2008, Plaintiff cleaned the offices of a local car dealership and completed his vocational training in welding.  (R. at 36).  He also attempted a full-time job as a welder, but left after several days.  (R. at 37).  Prior to his claimed disability onset date, Plaintiff worked as a laborer in a steel mill, luggage factory, and china factory.  (R. at 37 – 38). He also performed landscaping and janitorial work.  (R. at 37).

B.  **Treatment History**

On December 24, 2006, Plaintiff appeared in the emergency department of Ellwood City Hospital, in Ellwood City, Pennsylvania complaining of lower back pain following an attempt to push his son's stalled all-terrain vehicle ("ATV") home four days earlier.  (R. at 282 – 89). Physical examination revealed diffuse, non-localized paraspinal tenderness and spasm at the L2

---

[2]      In his Motion, Plaintiff limits his argument to errors committed by the ALJ when determining what disabling limitations were attributable to his back condition.  (ECF No. 11).  The court, therefore, will limit its discussion of the record to those facts relevant to Plaintiff's lower back impairments, only.

[3]      Plaintiff is defined as a, "Younger Person," at all times relevant to this determination.  20 C.F.R. §§ 404.1563, 416.963.

– L5 levels of Plaintiff's spine.  (R. at 282 – 89).  An x-ray of the lumbar spine yielded normal

results, except for potential post-traumatic changes of the spinous process at L2 as the result of a

possible pre-existing fracture.  (R. at 282 – 90).  There was no evidence of degenerative disc

disease.  (R. at 282 – 90).  Plaintiff was diagnosed with acute lumbar strain.  (R. at 282 – 89).  He

was advised to rest and place ice on his lower back four times per day.  (R. at 282 – 89).

Plaintiff was also provided prescription medication for pain, as needed. (R. at 282 – 89).

Plaintiff continued to complain of ongoing back pain.  He was treated for this pain by his

primary care physician Elpidio Damazo, M.D. using narcotic pain medication through May

2010.  (R. at 316 – 19, 374 – 81, 548 – 58, 645 – 47).  Dr. Damazo also referred Plaintiff to

orthopedic surgeons for evaluation, and to pain management clinics seeking additional treatment

options.  An MRI in early February 2007 was interpreted as showing a large central herniated

and extruded disc at the L5 – S1 level of Plaintiff's spine, causing mass effect on the thecal sac

and on the right S1 nerve root.  (R. at 314).  There was also a right-sided herniated/bulging disc

at the L4 – L5 level of Plaintiff's spine.  (R. at 314).  Some facet sclerosis was found at L3 – L4

and L4 – L5, but no spinal stenosis.  (R. at 314).  Plaintiff was diagnosed with chronic back pain

and right leg radiculopathy stemming from a large herniation at L5 – S1 and right sided

herniation at L4 – L5.  (R. at 314).

At an orthopedic consultation following the February MRI, Ashvin Ragoowansi, M.D.,

noted Plaintiff's reported back pain and right leg pain and weakness.  (R. at 320).  Dr.

Ragoowansi examined Plaintiff and found positive straight leg raising on Plaintiff's right side.

(R. at 320).  Dr. Ragoowansi reviewed Plaintiff's MRI and concluded that he suffered from two

herniated discs in his lumbar spine, the L5 – S1 level disc being slightly more significant.  (R. at

320).  Due to Plaintiff's claim that steroidal medication had provided him with relief from his

4

back pain following his initial injury, Dr. Ragoowansi recommended continuing steroidal medication and initiating a course of physical therapy.  (R. at 320).  The doctor also recommended epidural injections for pain relief if the more conservative therapies were not effective.  (R. at 320).  Dr. Ragoowansi did not wish to consider surgical intervention except as a last resort.  (R. at 320).

Following his evaluation, Plaintiff engaged in a pain management program at the recommendation of Dr. Damazo through Office Based Anesthesia Solutions.  Plaintiff received several epidural injections there in March 2007.  (R. at 302, 304, 451).  The epidural injections provided him with relief.  (R. at 300 – 01).  Records from the pain management clinic indicated that Plaintiff was found to have two significantly herniated discs in his lower back, and that his pain was not responding to more conservative treatments.  (R. at 305 – 08).  Activities Plaintiff performed as a janitor at that time worsened his pain.  (R. at 305 – 08).  Pain radiated into Plaintiff's right leg.  (R. at 305 – 08).  While Plaintiff's lower extremities appeared normal and showed no signs of tenderness, instability, or loss of strength, Plaintiff had positive straight leg raising, particularly on his right.  (R. at 305 – 08).  His diagnoses were noted to be herniated nucleus pulposis – lumbar, lumbago, and lumbar radiculopathy.  (R. at 305 – 08).

Plaintiff was discharged from this program on April 10, 2007 because he was misusing his narcotic medication.  (R. at 300 – 01).  When confronted about his medication usage, Plaintiff quickly became verbally abusive and aggressive.  (R. at 300 – 01).  At this time, Plaintiff was still complaining of extreme back pain, was unable to sit up straight, and exhibited significant paraspinal lumbar muscle tenderness and radiating pain in the right lower extremity.  (R. at 300 – 01).  He described his pain as burning, stinging, radiating, shooting, and sharp.  (R. at 300 – 01).  He also experienced numbness.  (R. at 300 – 01).  Sitting and standing for long periods

exacerbated his pain.  (R. at 300 – 01).   Plaintiff left the clinic making obscene gestures and abusive comments when questioned about his misuse of narcotic medications.  (R. at 300 – 01).  As a result, he was no longer welcome at the pain management clinic.  (R. at 300 – 01).

Plaintiff was seen by orthopedic surgeon Thomas D. Kramer, M.D. on March 20, 2007 for an evaluation.  (R. at 326).  Dr. Kramer noted Plaintiff's history of epidural injections for his back pain.  (R. at 326).  Upon physical examination, Dr. Kramer detected no spasm or swelling of Plaintiff's legs, but Plaintiff did exhibit positive straight leg raising of the right lower extremity and some mild atrophy of the right quad.  (R. at 326).  A strength and sensory examination were both normal, however, and Plaintiff's reflexes were intact.  (R. at 326).  Dr. Kramer's review of past diagnostic imaging indicated the existence of moderate L5 – S1 disc herniation and compression of the S1 nerve root.  (R. at 326).  There was a small herniation/ bulging disc at the L4 – L5 level, as well.  (R. at 326).  Dr. Kramer recommended that surgical intervention for the L5 – S1 herniation be scheduled immediately, and that Plaintiff continue with epidural injections in the meantime.  (R. at 326).  If Plaintiff's pain resolved with further injections, Dr. Kramer would cancel the surgery.  (R. at 326).  Surgery was scheduled for April 19, 2007, but never took place.  (R. at 327 – 33).

Plaintiff began visiting Mark R. LoDico, M.D. at Advanced Pain Medicine on June 5, 2007 at the behest of Dr. Kramer.  Dr. LoDico noted Plaintiff's two herniated discs and associated pain, observed that Plaintiff walked with a limp, and found that Plaintiff had not engaged in physical therapy to that point, but had instead treated his pain with medication and epidural injections.  (R. at 341).   On June 8, 2007, Plaintiff received an epidural injection from Dr. LoDico.  (R. at 339).  Plaintiff was re-evaluated approximately two weeks later and reported experiencing substantial relief from his pain; although, it was slowly returning.  (R. at 336).

Plaintiff did not wish to take pain medication to help treat his pain because he was attending school for welding at the time.  (R. at 336).  Upon physical examination, Plaintiff was observed to be in no acute distress, sat and conversed comfortably without demonstrating pain behaviors, rose from a seated position with assistance from his arms, exhibited a normal gait, was able to walk on his heels and toes, was able to squat, and had a full range of motion in his lumbar spine, although with pain on extension.  (R. at 336).  Plaintiff was advised to continue with epidural injections.  (R. at 336).  The record shows that Plaintiff received another epidural injection from Dr. LoDico on July 17, 2007.  (R. at 444).

Another MRI of Plaintiff's lumbar spine was not taken until March 26, 2008.  (R. at 372). Signal intensity and alignment of the spine were within normal limits.  (R. at 372).  Imaging showed some disc desiccation at the L5 – S1 and L4 – L5 levels of the spine.  (R. at 372).  Slight disc space narrowing was noted at the L4 – L5 and L2 – L3 levels.  (R. at 372).  The existence of likely mild to possibly moderate spinal stenosis and a slight annular bulge at L4 – L5 were also observed.  (R. at 372).  No disc herniation was found at that level, however.  (R. at 372).  Only a small right-sided disc herniation was found at the L5 – S1 level.  (R. at 372).

### C.  Functional Capacity Assessments

A physical residual functional capacity ("RFC") assessment of Plaintiff was completed by state agency physician Juan B. Mari-Mayans, M.D. on May 11, 2007.  (R. at 327 – 33).  After a review of the medical record, Dr. Mari-Mayans concluded that Plaintiff suffered from lumbar disc disease.  (R. at 327 – 33).  Plaintiff was found able to lift up to ten pounds on occasion, but only significantly less than ten pounds on a frequent basis.  (R. at 327 – 33).  Plaintiff could stand and walk for only two hours of an eight hour workday, sit for about six hours, push and pull with the upper and lower extremities only to a limited degree, frequently stoop, occasionally

7

climb, and never balance, kneel, crouch, or crawl. (R. at 327 – 33). Plaintiff was not otherwise limited. (R. at 327 – 33).

Plaintiff underwent a physical examination by state agency physician Daniel G. Christo, D.O. on behalf of the Bureau of Disability Determination on October 31, 2008. (R. at 387 – 94). Plaintiff complained of pain and limitation stemming from "three herniated discs and a fractured tailbone." (R. at 387 – 94). Plaintiff claimed that he initially injured his back in 2006 while pushing an ATV, and then further injured his back due to a slip and fall in 2007. (R. at 387 – 94). Plaintiff stated that he was scheduled for an operation in May of 2007 to relieve his back pain, but "chickened out," and did not go through with the procedure. (R. at 387 – 94). He also did not want to take time away from his training as a welder to have the surgical procedure performed. (R. at 387 – 94). Since that time, however, Plaintiff was told that he could not keep his job as a welder. (R. at 387 – 94). He was apparently terminated from his first and only position as a welder because he was limping. (R. at 387 – 94).

Dr. Christo observed significant tenderness of the right paravertebral area of the lumbar spine, and difficulty lying flat. (R. at 387 – 94). Range of motion of the lumbar spine was somewhat limited. (R. at 387 – 94). Plaintiff had positive straight leg raising on his right. (R. at 387 – 94). Otherwise, his lower extremities demonstrated full range of motion, his strength was full, and his reflexes were intact. (R. at 387 – 94). Plaintiff limped with his right leg, and showed poor heel walking, but had normal toe walking. (R. at 387 – 94). Plaintiff could squat slowly, but had difficulty standing up. (R. at 387 – 94). Dr. Christo noted the differing results of Plaintiff's February 2007 MRI and March 2008 MRI. (R. at 387 – 94). Dr. Christo also noted Plaintiff's normal x-rays. (R. at 387 – 94).

Plaintiff was diagnosed with lumbar disc disease with some radiculopathy and herniation and mild-to-moderate lumbar and lower right extremity dysfunction.  (R. at 387 – 94).  Plaintiff was determined to be physically limited to only occasional bending, kneeling, stooping, and crouching, and could never balance or climb.  (R. at 387 – 94).  He could frequently lift/carry up to twenty pounds, and occasionally carry up to twenty-five.  (R. at 387 – 94).  Plaintiff could stand and walk for four hours of an eight hour work day, and had no limitation in his ability to sit.  (R. at 387 – 94).

On February 11, 2010 Dr. Damazo completed a physical RFC assessment of Plaintiff. (R. at 637 – 41).  With respect to Plaintiff's back, Dr. Damazo noted diagnoses of degenerative joint disease and lumbar radiculopathy.  (R. at 637 – 41).  As a result, Plaintiff experienced a decreased range of motion.  (R. at 637 – 41).  Physical therapy had allegedly failed to resolve Plaintiff's pain, and his use of pain medication sedated him significantly.  (R. at 637 – 41).  Dr. Damazo opined that Plaintiff's pain would frequently prevent him from maintaining attention and concentration, render him incapable of low stress work, and prevent him from sitting or standing for more than twenty minutes at a time and more than two hours of an eight hour work day.  (R. at 637 – 41).  Any employment would need to allow Plaintiff the ability to sit and stand as needed and take a break from work for fifteen minutes every one to two hours.  (R. at 637 – 41).  Plaintiff could lift ten pounds occasionally and less than ten frequently.  (R. at 637 – 41). Plaintiff could rarely twist, stoop, or climb stairs, and could never crouch, squat, or climb ladders.  (R. at 637 – 41).  Plaintiff would likely miss more than four days of work per month. (R. at 637 – 41).  Dr. Damazo concluded his assessment by stating that Plaintiff's back pain and pain medication precluded him from engaging in gainful employment.  (R. at 637 – 41).

**D.  Administrative Hearing**

Plaintiff testified that his functional limitations emanated from his lower back, generating persistent numbness and shooting pain in his legs.  (R. at 38 – 39).  Dr. Damazo evaluated Plaintiff's physical condition approximately every two weeks and was primarily responsible for treatment of Plaintiff's back condition.  (R. at 39 – 40).  Plaintiff never underwent a surgical procedure to attempt to remedy his back pain, although a back surgery had at one point been scheduled.  (R. at 46).  He explained that his orthopedic surgeon believed that there was only a forty percent chance of improvement, and a strong possibility of worsening of Plaintiff's condition, requiring additional surgery.  (R. at 46).  Plaintiff opted out of surgery because he did not believe that the benefits outweighed the risks.  (R. at 46).  Plaintiff did receive epidural shots for treatment.  (R. at 49).

Plaintiff's condition was otherwise managed only with pain medication, anti-inflammatory medication, and the use of a cane for walking.  (R. at 40 – 41).  The cane was only necessary when Plaintiff was walking or standing for significant periods of time.  (R. at 42).  Plaintiff stated that he could not sit for more than ten or twenty minutes at a time before standing or lying down.  (R. at 44).  Plaintiff could stand unassisted for approximately one hour before requiring a rest.  (R. at 45).  He could walk half a block.  (R. at 45).  He was completely incapable of kneeling, squatting, stooping, or bending.  (R. at 45).  He was strong enough to lift a one gallon jug.  (R. at 45).

Plaintiff explained that when he worked after his claimed disability onset date, it was on a part-time basis only.  (R. at 43).  Plaintiff cleaned the offices of a car dealership approximately six days a week for three hours per day.  (R. at 43).  Eventually he was no longer capable of maintaining that level of employment due to back pain.  (R. at 44).   Plaintiff's activities at home

were also limited.  (R. at 47).  He did little in the way of cleaning, and his wife and brother completed most indoor and outdoor household tasks.  (R. at 47).  Plaintiff lived in a two-story home, but had a bathroom added to the first level of his home because he could no longer ascend the staircase.  (R. at 49).

Plaintiff attended and completed trade school for welding following his disability onset date.  (R. at 48).  The course was to take nine months, but as a result of a slip and fall accident that occurred in 2007, he took fifteen months to complete his training.  (R. at 48 – 49).  His accident worsened his back pain, and inevitably prevented him from engaging in welding work as well as the cleaning work which he had also attempted.  (R. at 48 – 49).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational level, and work experience could engage in employment which existed in significant numbers in the national economy if said person was limited to sedentary work, could not engage in repetitive bending, could not operate foot/pedal controls, and would need to change position between sitting and standing at least every ten to twenty minutes.  (R. at 51).

The vocational expert replied that jobs would be available to a person so limited.  (R. at 51).  The vocational expert explained that such a person would be eligible for work as a "document preparer," with 100,000 positions available in the national economy, as a "ticket check," with 150,000 positions available, and as a "small part assembler," with 225,000 positions available.  (R. at 51).  In response, Plaintiff's attorney asked the vocational expert whether such jobs would be available if the hypothetical person was off-task for thirty four to sixty six percent of any given work day.  (R. at 52).

The vocational expert answered that no work would be available to such a person.  (R. at 52).  Plaintiff's counsel then asked whether the jobs mentioned would still be available if the hypothetical person was limited to sitting no more than two hours of an eight hour work day, and could neither walk nor stand more than two hours.  (R. at 52).  The vocational expert stated that no jobs would be available.  (R. at 52).  Finally, Plaintiff's counsel asked whether jobs would be available to the hypothetical person if he or she would need unscheduled breaks for ten to fifteen minutes every one or two hours, or would miss four days of work per month.  (R. at 52).  According to the vocational expert, no jobs would be available to such a person.  (R. at 52).


IV.    STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute.  42 U.S.C. §§ 405(g)[4] and 1383(c)(3)[5].  Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole.  *See* 5 U.S.C. §706.  When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact.  *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

---

[4]       Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5]       Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.  *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).  If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390.  When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947).  The court will not affirm a determination by substituting what it considers to be a proper basis.  *Chenery*, 332 U.S. at 196 – 97.  Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).  The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## V.    DISCUSSION

In the present case, the decision of the ALJ was bifurcated.  He began by explicitly stating that the initial administrative denial of benefits for the period beginning December 22, 2006 and ending June 12, 2007, was the final determination of the Commissioner, as Plaintiff did not appeal this earlier denial.  (R. at 14).  The doctrine of *res judicata* thereby precluded Plaintiff from attempting to re-argue that he was disabled prior to June 13, 2007.  (R. at 14). Accordingly, consideration of earlier evidence to the extent that it was relevant only to the aforementioned period of claimed disability, did not occur.  (R. at 14).  Additionally, despite the submission of what Plaintiff styled as "new evidence" in his second application for benefits, the ALJ was not persuaded to re-open the prior determination.  (R. at 14).

14

The ALJ ultimately went on to state that the medical record demonstrated that Plaintiff suffered from medically determinable severe impairments in the way of degenerative joint disease of the lumbar spine with a herniated disc, and diverticulosis. (R. at 17). However, between the time period following Plaintiff's first denial of benefits and ending on the date of the ALJ's decision, June 18, 2010, Plaintiff was found ineligible for disability benefits. (R. at 17). In spite of the fact that Plaintiff was limited to sedentary work, that he was unable to do repetitive bending or use foot/pedal controls, and that he must have been able to change positions between sitting and standing every ten to twenty minutes, the testimony of the vocational expert indicated that Plaintiff was still capable of engaging in a significant number of jobs in existence in the national economy. (R. at 19, 23).

Plaintiff objects to the ALJ's decision to deny benefits to Plaintiff: he first argues that the ALJ erred in his application of the doctrine of *res judicata*; he argues that the ALJ erred in failing to re-open the matter of Plaintiff's first denial of benefits; and, he argues that the ALJ did not accord the opinions of Plaintiff's treating physicians appropriate weight. (ECF No. 11 at 7 – 17).

## A. *Res Judicata*

Plaintiff begins by alleging that the doctrine of *res judicata* was improperly applied by the ALJ, and that while the ALJ had the authority to limit the scope of Plaintiff's claim to the time period following his first denial of benefits, record evidence submitted as support for Plaintiff's first application, and re-submitted for the current application, should not have been omitted from explicit consideration by the ALJ. (ECF No. 11 at 7 – 8). Additionally, Plaintiff argues that even if *res judicata* was properly applied, equitable considerations provided within the Code of Federal Regulations warranted a re-opening of the original application.

15

It has been held by the Court of Appeals for the Third Circuit that the doctrine of *res judicata* applies to both judicial and administrative adjudications. *Tobak v. Apfel*, 195 F. 3d 183, 186 (3d Cir. 1999) (citing *United States v. Utah Constr. & Mining Co.*, 382 U.S. 394, 421 – 22 (1966)). In the administrative setting, *res judicata* will act to bar a claim for benefits when the same claimant has previously filed an application for the same claim of disability, and a final determination was handed down for the previous application. *Id.* (citing *Purter v. Heckler*, 771 F. 2d 682, 691 (3d Cir. 1985)); 20 C.F.R. §§ 404.957(c)(1), 416.1457(c)(1). Yet, even where the doctrine of *res judicata* may properly be applied, it is within the discretion of the Commissioner to re-open a claim or issue previously raised by a claimant. *Id. See* 20 C.F.R. §§ 404.987 – 89, 416.1487 – 89. Further, *de facto* re-openings have been found to have occurred where there was an administrative review of the entire record by the Commissioner, and a final determination regarding disability was made on the merits of the case – as opposed to invoking *res judicata*. *Id.* (citing *Coup v. Heckler*, 834 F. 2d 313, 317 (3d Cir. 1987)).

While the court has the ability to judge whether the doctrine of *res judicata* was applicable to a particular case, the court lacks jurisdiction to review or apply equitable administrative *res judicata* considerations, because the determination to re-open or preclude a claim is within the sole discretion of the Commissioner. *Id.* at 187 – 88; 20 C.F.R. §§ 404.987 – 89, 416.1487 – 89. "As . . . an administrative decision declining to reopen a prior claim or denying a subsequent claim on *res judicata* grounds does not require a hearing, it is not a 'final decision . . . made after a hearing' as required for jurisdiction under . . . the Act." *Id.* at 187 (quoting *Califano v. Sanders*, 430 U.S. 99, 107 – 08 (1977)); 42 U.S.C. § 405(g), (h).

Presently, the court finds that *res judicata* was properly applied to the case at hand. Plaintiff does not deny that his second application was based upon the same grounds as the first,

claimed the same onset date as the first, and incorporated the same supporting medical evidence as the first.  Additionally, Plaintiff does not deny that he failed to appeal his first application's denial, and therefore accedes that there was a final determination by the Commissioner as to his claim of disability beginning December 22, 2006 and ending June 12, 2007.  As discussed, the court does not have jurisdiction to review the ALJ's application of *res judicata* any further.  Whether or not good cause existed to re-open, or new evidence was presented justifying re-opening, is beyond the purview of this court.

Moreover, the court does not find a *de facto* re-opening of the prior application.  In his decision, the ALJ explicitly addressed the holding of the previous determination, and stated that *res judicata* prevented consideration of any claim as it pertained to the period beginning December 22, 2006 and ending June 12, 2007.  *Kaszer v. Massanari*, 40 Fed. App'x 686, 693 – 94 (3d Cir. 2002) (citing *Coup v. Heckler*, 834 F. 2d 313 (3d Cir. 1987)).  Further, the ALJ explicitly narrowed the time frame in which he was considering evidence for proof of Plaintiff's impairments/ disability.  *Id.* (Failure by the ALJ to make the above mentioned statements, in addition to actively reviewing all the evidence on record in order to reach a decision on the merits may constitute a *de facto* re-opening).  No *de facto* re-opening, therefore, occurred.

While the case law cited does not prohibit the review of previously submitted evidence to the extent that it is relevant to the applicable disability period, Plaintiff fails to explain why an MRI and a surgical consultation from February 2007 were relevant to Plaintiff's claimed period of disability beginning on June 13, 2007.  This is particularly important in light of the ALJ's findings that Plaintiff declined to go through with a scheduled surgery, and that a later MRI from March 2008 showed medical conditions far less severe than were earlier observed.  (R. at 19 – 20).  Moreover, a final determination that Plaintiff was not disabled for purposes of DIB and SSI

was earlier made based upon this record evidence, and went unchallenged.  Plaintiff fails to

explain how that same evidence is illustrative of Plaintiff's inability to work beginning June 13,

2007 and ending on the date of the ALJ's decision.  The court does not, therefore, find that the

ALJ's decision warrants a remand for consideration of the previously submitted medical

evidence raised by Plaintiff[6].

**B. Physician's Opinions**

Plaintiff next argues that the ALJ improperly dismissed the recent RFC assessment by Dr.

Damazo, in which it was indicated that Plaintiff had totally disabling limitations extending back

to February 2007.  (ECF No. 11 at 10 – 17).  The ALJ declined to give Dr. Damazo's opinion

significant weight, relying instead upon the findings of state agency physician Christo.  (R. at

22).

The Court of Appeals for the Third Circuit has held that a treating physician's opinions

may be entitled to great weight – considered conclusive unless directly contradicted by evidence

in a claimant's medical record – particularly where the physician's findings are based upon

"continuing observation of the patient's condition over a prolonged period of time."  *Brownawell*

*v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186

F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)).

However, a showing of contradictory evidence and an accompanying explanation will allow an

ALJ to reject a treating physician's opinion outright, or accord it less weight.  *Id.*  Further, the

determination of disabled status for purposes of receiving benefits – a decision reserved to the

Commissioner, only – will not be affected by a medical source simply because it states that a

claimant is "disabled," or "unable to work." 20 C.F.R. §§ 404.1527(e), 416.927(e).

---

[6]     The court also notes that the ALJ is not required to discuss each individual piece of evidence in a case.
*Fargnoli v. Massanari*, 247 F. 3d 34, 42 (3d Cir. 2001); *Hur v. Barnhart*, 94 Fed. App'x 130, 133 (3d Cir. 2004).
The ALJ did discuss all evidence provided during the relevant period following Plaintiff's first denial of benefits.

It is Plaintiff's contention that the ALJ provided very little evidence from the medical record which refuted Dr. Damazo's stark RFC assessment.  He also notes Dr. Damazo's long history treating Plaintiff's back pain, and medical evidence supporting Dr. Damazo's RFC assessment – evidence which was almost exclusively compiled during the period for which Plaintiff was found ineligible for benefits, and which was not discussed by the ALJ.  The court finds that the medical record following the date of Plaintiff's first denial of benefits was relatively sparse.  However, the ALJ still managed to refute Dr. Damazo's RFC assessment as it applied to the relevant period, by referring to a number of lines of evidence from the relevant period.

First, the ALJ described the incongruity between the severity of the findings in Dr. Damazo's treatment notes, and those within his RFC assessment.  (R. at 21).  Aside from regularly indicating that Plaintiff suffered back pain and some right leg pain and numbness, there are no statements reflecting the severity of the findings iterated in the RFC assessment, particularly with respect to the effects of Plaintiff's pain medications on his ability to work.  (R. at 21).  The ALJ went on to point out the disparities between what is claimed by Dr. Damazo's RFC assessment, and the less severe findings of Dr. LoDico while Plaintiff was receiving epidural injections which significantly reduced pain.  (R. at 21).

The ALJ also pointed out that Plaintiff was capable of part-time work and vocational training during the relevant period of claimed disability.  (R. at 21).  The examination performed by state agency physician Dr. Christo was also cited to counter the severity of Dr. Damazo's findings.  (R. at 22).  Upon a review of the record and a physical examination of Plaintiff, Dr. Christo did not find Plaintiff to be nearly as limited as Dr. Damazo had found.  (R. at 22).  Additionally, MRI results from March 2008 illustrated far less severe back impairments than had

19

been earlier interpreted.  (R. at 22).  In light of the discussion of this evidence from the relevant period of claimed disability to refute the severity of Dr. Damazo's claims, the court finds the determination of the ALJ to be supported by substantial evidence.

While Plaintiff again raised the issue of the ALJ's failure to discuss evidence both produced and submitted for proof of disability between December 22, 2006 and June 12, 2007, the court again recognizes that Plaintiff fails to indicate how this evidence is probative in the relevant period of claimed disability.  This same evidence was found to be insufficient to show disability during the period in which it was produced, and Plaintiff did not challenge that finding. As such, the court does not find that substantial evidence was lacking due to the ALJ's omission of this previously submitted evidence from discussion.

**VI.    CONCLUSION**

Based upon the foregoing, the court finds that the ALJ properly applied the doctrine of *res judicata* to Plaintiff's previous disability ruling, that he did not affect a *de facto* re-opening, and that he did not improperly disregard the severity of Dr. Damazo's findings.  The decision was supported by substantial evidence.  Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed.  An appropriate Order follows.

December 13, 2011                                        s/Lisa Pupo Lenihan
                                                                Lisa Pupo Lenihan
                                                                Chief United States Magistrate Judge